## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 3:13-cr-2 (MPS) |
| RASHAD JONES | |

### <u>RULING ON MOTION TO SUPPRESS</u>

On January 3, 2013, a grand jury returned an Indictment [doc. # 15] charging Defendant Rashad Jones ("Jones") with narcotics and firearms offenses in connection with an alleged conspiracy to distribute crack cocaine in the City of Hartford.[1]  Jones has moved to suppress evidence seized by investigators (1) following the stop of a Chevy Tahoe in which Jones was riding as a passenger; (2) from the second floor apartment at 232 Westland Street, a three-family apartment building, in Hartford; and (3) from a Dodge Magnum parked behind 232-234 Westland Street.  The Court held a two-day evidentiary hearing on the motion to suppress [doc. #103] on December 12, 2013, and February 20, 2014, and now denies the motion in its entirety.  As explained more fully below, (1) the investigators had probable cause to arrest Jones when they stopped the Chevy Tahoe, the search of his person was a valid search incident to arrest, and the owner of the Tahoe consented to the search of the vehicle; (2) even if the pre-warrant entry at 232 Westland Street is considered illegal – an issue the Court does not decide -- the search warrant affidavit contains sufficient information – without the information obtained from the initial entry – to support a finding of probable cause to issue the warrant; and (3) investigators

---

[1] The Indictment also charged two other co-defendants, Charles Tyson and Madelaine Rivera, in connection with the alleged drug conspiracy.  Both Tyson and Rivera have entered guilty pleas.  [<u>See</u> doc. ## 55, 86.]

had reasonable suspicion to prevent the tow truck driver from removing the Dodge Magnum from the scene, subsequent investigation gave them probable cause to search the vehicle, and a warrant was not required under the automobile exception to the warrant requirement.

## I.     Factual Findings

At the evidentiary hearing, the Court heard testimony from two Government witnesses, DEA Task Force Officer ("TFO") James Campbell and Sergeant Michael Coates of the Hartford Police Department, and two defense witnesses, Jones and Curtis Stevenson, who was present at the second floor of 232 Westland Street during the search.  Based on that testimony and the exhibits admitted into evidence, the Court makes the following findings of fact.  Additional facts are set forth as needed in the legal analysis section.

TFO Campbell is a Hartford police officer and a member of the DEA Task Force for the Hartford Resident Offices.  The DEA Task Force handles a range of narcotics investigations from street level enforcement to large scale narcotics trafficking involving money laundering and gang activity, as well as investigations involving crimes of violence and firearms offenses. (12/12/13 Hr'g Tr. Vol. I at 6-7.)  TFO Campbell testified that approximately five years ago he received information from a confidential informant identifying Jones as a narcotics dealer.  (Id. at 8-9.)  Shortly thereafter, while TFO Campbell was conducting surveillance in the south end of Hartford, he observed what appeared to him to be a narcotics transaction between Jones and a female.  TFO Campbell then arrested Jones for possession and sale of crack cocaine and seized crack cocaine from his person.  (Id. at 9.)

On November 25, 2011, the Hartford Police Department received an anonymous call on its "crime stoppers" line and an anonymous web tip identifying Jones as being involved in narcotics activity and stating that "weapons may be involved."  On August 9, 2012, the police

received a second anonymous call on its "crime stoppers" line and a second anonymous web tip stating that Jones was manufacturing and selling crack cocaine in the Evergreen Avenue area of Hartford. (Id. at 10-16; Gov't Exs. 1-4.) The information contained in these tips was forwarded to TFO Campbell. Based on this information, TFO Campbell conducted an investigation of Jones beginning in the summer of 2012. (12/12/13 Hr'g Tr. Vol. I at 16.)

From August to November 2012, investigators conducted daily surveillance at 17 Evergreen Avenue. (Id. at 36.) Investigators observed Jones routinely meeting with individuals on Evergreen Avenue, including Tyrone Upshaw, Charles Tyson, Madelaine Rivera, and Curtis Stevenson. Investigators also observed Jones and his associates driving a variety of vehicles, including a green Infiniti, a green Chevy Tahoe, a blue Honda with Florida plates, and several rental vehicles. (Id. at 36-50; Gov't Exs. 5, 5A-5N.)

TFO Campbell testified that Jones has dealt narcotics out of vehicles on numerous occasions. (2/20/14 Hr'g Tr. Vol. I at 54.) According to TFO Campbell, each of Jones's prior convictions for narcotics-related offenses, of which there were five between 2005 and 2011, involved Jones's operating a motor vehicle to conduct his narcotics activities. Further, with respect to each of these matters, TFO Campbell testified that crack cocaine was seized from either within the vehicle that Jones was operating or from his person.[2] (Id. at 70-71; Vol. II at 22.)

---

[2] It is unclear from the testimony whether any of these convictions were for the distribution or sale of narcotics, as opposed to mere possession. (See 2/20/14 Hr'g Tr. Vol. II at 22-27.) Jones testified that all of his convictions were for possession of crack cocaine, but he did admit to having been arrested on at least one occasion in 2011 for possession with intent to sell. (Id. at 23, 27.) Further, as detailed above, TFO Campbell testified to having observed conduct involving Jones and a female that was consistent with the sale of narcotics and arresting him for possession and sale of crack cocaine. (12/12/13 Hr'g Tr. Vol. I at 9.)

On September 6, 2012, investigators observed Upshaw leave 17 Evergreen Avenue with a black plastic bag and drive away in the green Infiniti.  Investigators subsequently conducted a motor vehicle stop of Upshaw for motor vehicle violations.  (12/12/13 Hr'g Tr. Vol. I at 50.) Upshaw provided his consent to search the vehicle and investigators found 15 bags of packaged marijuana within the black plastic bag and $2,000 in cash.  Investigators also found several personal items, including a set of keys to a Chevy Tahoe with a tag labeled "Buck," a known alias used by Jones, a money gram from Walmart labeled "Rashad Jones," a Connecticut Light & Power bill for Jenisha Nealy listing her address as 71 Giddings Avenue in Windsor, and a receipt from a dentist office listing Jones's address as 232 Westland Street.  (12/12/13 Hr'g Tr. Vol. I at 50-52; Gov't Ex. 6A-D.)  After waiving his Miranda rights, Upshaw stated that Jones had been a friend of his for approximately five years, that Upshaw had been selling marijuana as a source of income, and that he was living at 17 Evergreen Avenue with Buck's uncle Curtis.  (12/12/13 Hr'g Tr. Vol. I at 56-57.)  When asked whether he knew if Jones had any involvement with narcotics, Upshaw told TFO Campbell that "Jones does what he does and I do what I do and he doesn't know anything about that."  (Id. at 56-57.)

After the stop of Upshaw, investigators began conducting surveillance at 71 Giddings Avenue.  Based on their observations, it appeared to investigators that Jones and Nealy were living there, as the investigators observed the two leaving in the early morning hours and returning later in the evening.  Investigators also observed the Chevy Tahoe and several other rental vehicles they had seen Jones driving on previous occasions parked in the driveway at 71 Giddings Avenue.  (Id. at 58-59.)

In October 2012, other members of the Hartford police department executed a search warrant at a location just south of 17 Evergreen Avenue.  A large quantity of crack cocaine and

firearms were seized from that location and numerous individuals were arrested.   Shortly thereafter, investigators stopped seeing Jones, Rivera, and Tyson at 17 Evergreen Avenue.  TFO Campbell testified that he suspected they decided to move their narcotics operation elsewhere because of the heightened law enforcement activity in the area.  (Id. 60-61.)

During the course of the investigation, TFO Campbell ran a check for Jones in the Hartford Police Department in-house computer system, which is a database that documents all police activity within the City involving a particular person.  The most recent address associated with Jones was 232 Westland Street, second floor.  (Id. at 68-69.)  Investigators also conducted a Lexis Nexis search for Jones and his address was listed in that database as 232 Westland Street, second floor.  (Id. at 30.)

On November 26, 2012, investigators observed Nealy and Jones leave 71 Giddings Avenue in the Chevy Tahoe and drive to Hartford.   Investigators subsequently conducted a motor vehicle stop of the vehicle.  At the stop, Nealy identified her address as 71 Giddings Avenue and Jones identified his address as 232 Westland Street.  (Id. at 62-64.)

232 Westland Street is a three-family apartment building with three floors.[3]  (See Gov't Exs. 7, 12.)  Jones testified that his mother lives on the first floor, he resides periodically on the second floor with his "roommate" Upshaw, and other persons whom he has heard, but not seen, live on the third floor.  Jones further testified that he does not own the building and that he and Upshaw pay rent to the landlord.  (2/20/14 Hr'g Tr. Vol. II at 14-15, 39-41, 46-47.)  TFO Campbell testified that during the search of the second floor apartment at 232 Westland Street, he observed little evidence to suggest that it was a full-time residence.   It contained only a

---

[3]  Although the actual street address of this building is 232-234 Westland Street, throughout the testimony, witnesses referred to it generically as "232 Westland Street."  For that reason, the Court will refer to the property located at 232-234 Westland Street as 232 Westland Street.

couch, TV, DVD stand and speaker, table, chairs, and some clothes in the bedroom.  (12/12/13 Hr'g Tr. Vol. II at 27-28.)  The Government introduced into evidence a photograph of the front of the property located at 232 Westland Street.  (Gov't Ex. 7.)  From the photograph, it appears that 232 Westland Street has one common driveway accessible to the tenants of all three floors and also apparently accessible to the tenants of what appears to be a multi-family building next door.

On December 18, 2012, at approximately 8:00 a.m., investigators observed Jones exit 71 Giddings Avenue and enter a black Dodge Magnum that was parked in the driveway.  (12/12/13 Hr'g Tr. Vol. I at 70.)  Investigators had observed the Dodge Magnum on one prior occasion during the course of their surveillance.  (2/20/14 Hr'g Tr. Vol. I at 5, 51.)  Jones drove the vehicle to 232 Westland Street, pulled into the shared driveway, and parked the vehicle behind the building.  (12/12/13 Hr'g Tr. Vol. I at 70-71.)  Shortly after Jones arrived, investigators observed Upshaw arrive in a silver rental car, park behind 232 Westland Street, and leave a few minutes later.  (Id. at 71.)  At approximately 9:20 a.m., investigators witnessed Tyson and Rivera arrive in the green Infiniti and pull into the rear of 232 Westland Street.  (Id. at 72, 83-84.)

At approximately 10:15 a.m., investigators observed Tyson and Rivera pull out of the driveway and take off at a high rate of speed in the Infiniti.  Investigators conducted a stop of the Infiniti for motor vehicle violations.  (Id. at 85.)  As TFO Campbell approached the vehicle, he smelled a strong odor of marijuana.  When questioned, Tyson and Rivera admitted to having just finished smoking marijuana and Tyson stated that he had some in his pocket.  (Id. at 86.)

Tyson and Rivera waived their Miranda rights and consented to a search of the vehicle. In the back seat, TFO Campbell found a narrow cardboard box with a knotted plastic bag containing 56 grams of crack cocaine.  (Id. at 87.)  When TFO Campbell asked Rivera whose

cocaine it was, she initially responded that the cocaine belonged to Upshaw.  Rivera claimed that she had just dropped Upshaw off at 232 Westland Street and that he had a whole "cocaine factory" up there.  (Id. at 90.)  Rivera also said that she had gone up to the third floor at 232 Westland Street to purchase the crack cocaine.  (2/20/14 Hr'g Tr. Vol. I at 14, 16.)

Tyson told investigators that he and Rivera had gone to 232 Westland Street, that they had met a party named Buck there, and that they had purchased the crack cocaine from Buck on the third floor.  (12/12/13 Hr'g Tr. Vol. I at 91.)  Further, Tyson said that he had known Jones for approximately one year, that he would obtain 63 grams of crack cocaine from Jones several times a week, and that there was a much larger quantity of narcotics still at 232 Westland Street with Jones.  (12/12/13 Hr'g Tr. Vol. I at 92.)

While Rivera was speaking with investigators, she asked several times if she could call her babysitter because her son was with her babysitter at 232 Westland Street.  TFO Campbell asked Rivera who her babysitter was and she said it was Rashad.  Rivera's phone then rang a couple times.  Rivera showed the phone to TFO Campbell and the name on the caller id was "King's godfather."  Rivera stated that "King's godfather" was Rashad and that Rashad was the babysitter.  (Id. at 93.)  In his testimony, Jones stated that he was Rivera's son's godfather and that he brought her son to school "pretty much every day."  (2/20/14 Hr'g Tr. Vol. II at 29.)  Investigators later confirmed that there was no child at 232 Westland Street on December 18, 2012.  (12/12/13 Hr'g Tr. Vol. I at 93.)

 Investigators arrested Tyson and Rivera, who were later charged in the same Indictment as Jones, took them into custody, and placed them into marked Hartford police cruisers.  TFO Campbell testified that based on the statements made by Tyson and Rivera at the stop, the crack cocaine seized from the Infiniti, and the other evidence developed during the investigation,

investigators made the decision at that time also to arrest Jones as part of a conspiracy involving Jones, Tyson, and Rivera.  (12/12/13 Hr'g Tr. Vol. I at 102-03.)

At approximately 10:30 a.m., Nealy arrived at 232 Westland Street in the Chevy Tahoe and picked up Jones.  Shortly after the Tahoe pulled out of 232 Westland Street, investigators stopped the vehicle on Edgewood Street.   (Id. at 106.)   Jones testified that investigators approached the vehicle with their weapons out.  Jones stated that investigators took him out of the vehicle, placed him in handcuffs with his arms behind his back, walked him back to the unmarked police car, and then searched his pockets.  (2/20/14 Hr'g Tr. Vol. II at 11-13.) Investigators seized approximately $4000 from his person.  (12/12/13 Hr'g Tr. Vol. I at 120-21.) Investigators then transported Jones back to 232 Westland Street in a Hartford police cruiser. (Id. at 125; 2/20/14 Hr'g Tr. Vol. II at 17.)   Jones testified that investigators held him in the police cruiser for four and a half hours.  (2/20/14 Hr'g Tr. Vol. II at 18.)  Jones further testified that investigators kept reiterating that he was not under arrest during this time and that he was only being detained because they were conducting an investigation.  (Id. at 16.)

Kenneth Combs, Nealy's father and the registered owner of the Chevy Tahoe, arrived at the scene of the stop and provided verbal and written consent to search the vehicle.  Nealy also provided her verbal consent to the search.  (12/12/13 Hr'g Tr. Vol. I at 115-18; Gov't Ex. 9.) Investigators searched the Chevy Tahoe and found an additional $4400 in U.S. currency within a child's backpack in the back seat of the vehicle.  (12/12/13 Hr'g Tr. Vol. I at 118-20; Gov. Ex. 10.)   Nealy also provided her verbal and written consent to search 71 Giddings Avenue. (12/12/13 Hr'g Tr. Vol. I at 122; Gov't Ex. 11.)   Investigators subsequently searched the residence at 71 Giddings Avenue and recovered a money counter box from the bedroom. 12/12/13 Hr'g Tr. Vol. I at 124.)

While investigators were attending to the stop of the Chevy Tahoe, Upshaw was stopped in a rental vehicle by Hartford police.  (12/12/13 Hr'g Tr. Vol. II at 7.)  TFO Campbell went to the stop and Upshaw told him that there were pit bulls on the third floor of 232 Westland Street and they were not in cages.  When asked whether there was anyone else at 232 Westland Street, Upshaw responded that he believed that Rashad's uncle was there.  (Id. at 7-8.)

Thereafter, TFO Campbell testified that he drove to 232 Westland Street and approached the police cruiser holding Jones.  TFO Campbell stated that he read Jones his Miranda rights and Jones said that he understood those rights.  TFO Campbell testified that he had a brief discussion with Jones, including asking him what floor he lived on.  TFO Campbell testified that Jones told him he lived on the second floor.  (12/12/13 Hr'g Tr. Vol. I at 126.)  In his testimony, Jones stated that although TFO Campbell read him his Miranda rights, he did not waive them and further disputes that he said anything to TFO Campbell, including that he lives on the second floor.  (2/20/14 Hr'g Tr. Vol. II at 20.)  The Court credits the testimony of TFO Campbell on this issue.

TFO Campbell further testified that when he arrived at 232 Westland Street he was notified by Sergeant Coates that a tow truck operator had driven to the rear of 232 Westland Street, put the Dodge Magnum up on its lift, and started to pull out of the driveway.  Sergeant Coates told TFO Campbell that he had stopped the tow truck operator and told him the Magnum needed to stay on the scene.  (12/12/13 Hr'g Tr. Vol. II at 14.)  Sergeant Miller of the Hartford police then notified TFO Campbell that he had contacted the tow truck company, Metro Auto, and spoke with a manager there who informed him that a party identifying himself as Buck wanted the vehicle towed because the struts were bad.  (Id. at 11.)  TFO Campbell testified that the phone number that Buck provided to the tow truck company was one that had previously

been identified in the "crime stopper" tips.  Investigators instructed the tow truck operator to place the Dodge Magnum back in the rear of 232 Westland where it had been parked.  (Id. at 11-12.)

Sergeant Coates testified that he was the first investigator to enter 232 Westland Street. He stated that he entered through the front of the building, but could not recall whether there was a door there.  He stated, however, that if there was a door there, it was unlocked.  (2/20/14 Hr'g Tr. Vol. I at 93, 97-98.)  Sergeant Coates then testified that he approached a second door that led to a stairwell to the second and third floor apartments.  He stated that this door was locked and he kicked it in to gain access to the second and third floors.  (Id. at 98.)

TFO Campbell testified that he and investigators went up to the second floor apartment and attempted to gain access by trying a set of keys that did not work and by knocking on the door for several minutes.  (12/12/13 Hr'g Tr. Vol. II at 9-10.)  TFO Campbell testified that he could not recall whether he obtained the keys from another investigator at the stop of the Chevy Tahoe or from Jones when he spoke with him outside of 232 Westland Street.  (Id. at 9.)  TFO Campbell stated that when he could not gain access to the second floor, he drove to the federal courthouse to meet with a prosecutor and prepare an affidavit to support an application for a warrant to search the second and third floors at 232 Westland Street.  (Id. at 14-15.)  Before preparing the affidavit, TFO Campbell received a call from a DEA Special Agent about 232 Westland Street.  The Agent stated that a confidential informant who had direct knowledge of Jones at 232 Westland Street told him that Jones resides on the second floor, but often conducts his narcotics transactions on the third floor.  (Id. at 15-16.)

While TFO Campbell was at the federal courthouse, investigators gained access to the second floor apartment.[4]  Sergeant Coates, who had remained at 232 Westland Street, testified that he and other investigators conducted a protective sweep of the apartment to make sure that the area was secure.  (2/20/14 Hr'g Tr. Vol. I at 74.)  During the protective sweep, investigators saw a money counter in plain view on the dining room table.  (12/12/13 Hr'g Tr. Vol. II at 21-22.)  Investigators also conducted a protective sweep of the third floor, but no evidence was found.  (Id. at 18-19.)  After the sweeps were completed, Sergeant Coates testified that he contacted TFO Campbell to inform him that both the second and third floors were secure and they would be waiting for him.  (2/20/14 Hr'g Tr. Vol. I at 78.)  Sergeant Coates also told TFO Campbell that investigators observed a money counter on the dining room table.  (12/12/13 Hr'g Tr. Vol. II at 21-22.)

Thereafter, based on the affidavit of TFO Campbell, United States Magistrate Judge Thomas P. Smith authorized a search of the second and third floors of 232 Westland Street.[5]  (Id. at 22; Gov't Exs. 12, 13.)  After the warrant was signed, TFO Campbell telephoned investigators to instruct them to begin the search and returned to 232 Westland Street to join them.  (12/12/13 Hr'g Tr. Vol. II at 25.)  During the search of the second floor apartment, investigators found a quantity of crack cocaine, a quantity of marijuana, bags, a collection of pots that would typically

---

[4] The parties dispute whether investigators obtained valid consent to enter the second floor apartment to conduct a protective sweep.  Although Sergeant Coates testified that Stevenson opened the door and consented to the entry of the investigators, see 2/20/14 Hr'g Tr. Vol. I at 75-76, Stevenson testified that he did not answer the door and that investigators were already in the apartment when they woke him from his sleep.  (2/20/14 Hr'g Tr. Vol. II at 72.) The Court need not decide this issue because, as discussed below, the Court's conclusions do not depend on whether investigators initially entered the premises lawfully.  (See infra Part II.B.) For the same reason, the Court expresses no opinion about whether Sergeant Coates acted lawfully in kicking down the door to gain entry to the second and third floors.

[5] For a more detailed recitation of the statements set forth in the affidavit submitted in support of the search warrant, see infra Part II.B.

be used to cook crack cocaine, various calibers of ammunition for firearms, a shotgun shell, and a Sprint phone bill for Jones.  (12/12/13 Hr'g Tr. Vol. II at 27; Gov't Ex. 15.)  Investigators seized no evidence from the third floor.  (12/12/13 Hr'g Tr. Vol. II at 28.)

After the searches of the second and third floor apartments were complete, TFO Campbell walked to the rear of the shared driveway at 232 Westland Street where the Dodge Magnum was parked.  (Id. at 30.)  He testified that because the windows were tinted, he walked right up to the vehicle, put his head on the rear hatch window, and looked inside.  (Id. at 30, Gov't Ex. 14A.)  TFO Campbell testified that he saw an open paper bag sitting inside a black Zales bag and, within the open paper bag, he saw what looked like one box with a second box on top of it.  TFO Campbell recognized the bottom box to be a box of Lawman ammunition.  (Id. at 31-35; Gov't Exs. 14B-C.)  He testified that Lawman is a particular brand of ammunition that has a distinct logo that looks almost like a Nike "swoosh" symbol.  (12/12/13 Hr'g Tr. Vol. II at 35.)  The Court credits TFO Campbell's testimony regarding these observations.  Further, TFO Campbell testified that he knew at this time that Jones was a convicted felon.[6]  (Id. at 33.)  Thereafter, investigators conducted a warrantless search of the Dodge Magnum and seized several cookies[7] of crack cocaine, 605.2 grams of powder cocaine, a digital scale, three firearms, two of which were loaded, ammunition, and loaded magazines.  (Id. at 35-40; Gov't Ex. 14B-M, 15, 16.)

---

[6] See 18 U.S.C. § 922(g) (felon in possession statute prohibits possession by a felon of "any firearm or ammunition.")

[7] TFO Campbell testified that a "cookie" consists of 128 grams of crack cocaine and "a half a cookie" consists of 63 grams.  TFO Campbell testified "cookies" are larger amounts of crack that are then chopped up and resold at street level.  He stated that although cost varies, a whole cookie would have likely sold for between $2,500 and $3,000 in the Hartford area in 2012.  (12/12/13 Hr'g Tr. Vol. I at 88-89.)

## II.      Legal Analysis

Jones moves to suppress evidence seized (1) following the stop of the Chevy Tahoe; (2) from the second floor apartment at 232 Westland Street; and (3) from the Dodge Magnum.  The Court addresses each of these below.

### A.      Chevy Tahoe

Jones argues that investigators were not justified in stopping the Chevy Tahoe because they had neither reasonable suspicion nor probable cause to believe that a traffic violation or other offense had been committed.   (Def.'s Mem. Supp. Mot. Suppress at 33-35.)   The Government counters that the stop was justified because investigators had probable cause to arrest Jones for conspiracy to distribute crack cocaine based on evidence developed through their investigation, including evidence gathered from the stop of Tyson and Rivera earlier that morning.  (12/12/13 Hr'g Tr. Vol. I at 110-11.)

Police may arrest a suspect in a public place without a warrant as long as they have probable cause to believe that a felony has been committed.  See, e.g., United States v. Watson, 423 U.S. 411, 418 (1976) ("The usual rule is that a police officer may arrest without a warrant one believed by the officer upon reasonable cause to have been guilty of a felony.") (quoting Carroll v. United States, 267 U.S. 132, 156 (1925)).  The Court finds that there was probable cause to stop the Chevy Tahoe on Edgewood Street and arrest Jones for conspiracy to distribute crack cocaine.  On the morning of December 18, 2012, at approximately 8:00 a.m., just a few hours before the stop of the Chevy Tahoe, investigators observed Jones drive to 232 Westland Street.  (12/12/13 Hr'g Tr. Vol. I at 70-71.)  An hour or so later, Tyson and Rivera arrived at 232 Westland Street in the green Infiniti and, at approximately 10:15 a.m., pulled out of 232 Westland Street at a high rate of speed.  Investigators conducted a motor vehicle stop of the

Infiniti and seized a knotted plastic bag containing 56 grams of crack cocaine from a cardboard box found in the back seat of the vehicle.  (Id. at 85-87.)  Tyson told investigators that he and Rivera had gone to 232 Westland Street and purchased the crack cocaine from Jones.  (Id. at 91.) Tyson stated that he had known Jones for approximately one year, that he would obtain 63 grams of crack cocaine from Jones several times a week, and that there was a much larger quantity of narcotics still at 232 Westland Street with Jones.  (Id. at 91-92.)  Further, although Rivera claimed that the drugs belonged to Upshaw, she stated that Upshaw had a whole "cocaine factory" up there and later stated that she had purchased the crack cocaine from the third floor at 232 Westland Street.  (Id. at 90; 2/20/14 Hr'g Tr. Vol. I at 14, 16.)  While Rivera was speaking with investigators, she asked several times if she could call her babysitter, Rashad, who was watching her son.  Further, during the stop, Rivera's phone rang a couple of times, each time with the name "King's godfather" appearing on the caller id screen.  Rivera stated that "King's godfather" was Rashad, her son's babysitter.  (12/12/13 Hr'g Tr. Vol. I at 93.)

These statements of Tyson and Rivera and the crack cocaine seized from the green Infinity, coupled with the other evidence obtained by investigators through their investigation, provided investigators with probable cause to arrest Jones for conspiracy to distribute crack cocaine.

Once under arrest, a suspect may be searched without a warrant.  See, e.g., United States v. Robinson, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to arrest requires no additional justification.").  Although Jones argues that investigators kept reiterating that he was not under arrest and that he was only being detained because they were conducting an investigation, the evidence at the hearing showed that, in spite of what they

14

might have told Jones, the investigators had arrested him.  An arrest, the "quintessential seizure of the person," is marked by "either physical force . . . or, where that is absent, submission [of the suspect] to the assertion of authority."   California v. Hodari D., 499 U.S. 621, 624, 626 (1991).  "An arrest need not be formal; it may occur even if the formal words of arrest have not been spoken provided that the subject is restrained and his freedom of movement is restricted." Posr v. Doherty, 944 F.2d 91, 98 (2d Cir. 1991) (citing United States v. Levy, 731 F.2d 997, 1000 (2d Cir. 1984) (an arrest occurred when suspect was ordered to "freeze" and was forced to stand spread-eagle against a wall); United States v. Moreno, 897 F.2d 26, 31 (2d Cir. 1990) (defendant was arrested "when [the police officer] pushed [the defendant] against the wall and told him not to move.")); see also United States v. Newton, 369 F.3d 659, 676 (2d Cir. 2004) (reasoning that "[h]andcuffs are generally recognized as a hallmark of a formal arrest" and "telling a suspect that he is not under arrest does not carry the same weight in determining custody when he is in handcuffs as it does when he is unrestrained" to find that defendant, who was placed in handcuffs, was in custody for Miranda purposes where he "was specifically advised that he was not being placed under arrest and that the restraints were being employed simply to ensure his own safety and that of the officers."); United States v. Henley, 984 F.2d 1040, 1042 (9th Cir. 1993) (holding that handcuffed suspect placed in back seat of a squad car was in custody for purposes of Miranda even though agents told him he was not under arrest).

In the present case, Jones testified that investigators approached the vehicle with their weapons out, removed him from the Chevy Tahoe, placed him in handcuffs with his arms behind his back, and walked him to the unmarked police car where he was searched.  (2/20/14 Hr'g Tr. Vol. II at 11-12.)   These facts demonstrate that Jones was restrained and his freedom of movement was restricted.  Thus, even if investigators told Jones that they were only detaining

him, he was "arrested" for purposes of the Fourth Amendment and the ensuing search of his person was justified as a search incident to arrest.

Investigators were also entitled to search the Chevy Tahoe because they received consent to do so from Combs, the registered owner of the vehicle, and Nealy, the driver of the vehicle. (12/12/13 Hr'g Tr. Vol. I at 115-18; Gov't Ex. 9.); see, e.g., United States v. Elliott, 50 F.3d 180, 185 (2d Cir. 1995) ("a warrantless entry and search are permissible if the authorities have obtained voluntary consent of a person authorized to grant such consent.") (citation omitted).

### B.     232 Westland Street

Jones argues that investigators' initial warrantless entry into the second floor apartment at 232 Westland Street was unlawful and cannot be justified under the protective sweep or consent exceptions to the warrant requirement.  He further argues that the evidence subsequently seized from that apartment pursuant to the warrant must be suppressed as fruit of the poisonous tree. (See Def.'s Mem. Supp. Mot. Suppress at 10-19; 2/20/14 Hr'g Tr. Vol. II at 106-07.)  The Government contends that its initial entry into the apartment was lawful, but contends that even if it was not, once the reference to the money counter -- the only evidence seen by investigators during their warrantless entry into the apartment -- is removed from the warrant affidavit, the warrant still sets forth sufficient facts to justify a finding of probable cause and thus the issuance of a search warrant for the second and third floor apartments.  (Gov't Mem. Opp. Mot. Suppress [doc. # 65] at 18-23.)

"When an application for a search warrant includes both tainted and untainted evidence, the warrant may be upheld if the untainted evidence, standing alone, establishes probable cause." Laaman v. Williams, 973 F.2d 107, 115 (2d Cir. 1992), cert. denied, 507 U.S. 954 (1993). Where improper material is included in a warrant application, the court should disregard that

information and "determine whether the remaining portions of the affidavit would support probable cause to issue the warrant."  United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000).  "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate."  Id.  "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'"  Id. (quoting United States v. Ferguson, 758 F.2d 843, 849 (2d Cir. 1985)).  "Probable cause is 'a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Canfield, 212 F.3d at 718 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

When the reference to the money counter – the only "tainted" piece of information in the warrant affidavit -- is stricken from the affidavit, there is sufficient information to support a finding of probable cause that evidence of illegal narcotics activity would be found within the second floor apartment at 232 Westland Street.  (Affidavit of TFO Campbell, dated December 18, 2012 (the "Affidavit"), ¶ 19, attached to Gov't Ex. 13.)

The Affidavit is seven pages long and consists of 20 paragraphs.  In two sentences in paragraph 16, the Affidavit references the money counter that was found in the second floor apartment.  (Id. ¶ 16.)  Specifically, paragraph 16 reads: "Investigators knocked on the door to the second floor apartment at 232 Westland Street (the Subject Premises) and received consent from the occupant (who is believed to be a relative of Jones) to conduct a security sweep of the apartment.  During the security sweep, investigators saw in plain view on the kitchen table a

money counter."   Once these two sentences are removed from the Affidavit, the following information remains:

- Investigators received detailed information from a cooperating source that Jones was purchasing kilogram quantities of cocaine and cooking the cocaine into crack cocaine for resale to his customers.  (Id. ¶ 5.)

- Investigators received a Crime Stopper tip line complaint that Jones was dealing crack cocaine in the area of 17 Evergreen Street in Hartford.  The complaint listed several phone numbers used by Jones and three vehicles used by Jones, including a green Infiniti and a green Chevy Tahoe.  (Id. ¶ 6.)

- Investigators conducted surveillance in the 17 Evergreen Street area and observed Jones at the location during the early morning hours and on an almost daily basis. Investigators also observed Upshaw, Rivera, and Tyson meet with Jones at the location and observed Jones using the Chevy Tahoe and various rental vehicles.  (Id. ¶ 7.)

- On September 6, 2012, investigators observed Upshaw leave 17 Evergreen Street with a black plastic bag and drive away in the green Infiniti.  Investigators conducted a motor vehicle stop and seized the black bag, which contained a quantity of marijuana packed for street sale.  Investigators also seized personal items of Jones from the Infiniti, including a dental receipt for Jones listing his address as 232 Westland Street.  (Id. ¶ 8.)

- Investigators observed Jones at 71 Giddings Avenue in Windsor, Connecticut, on multiple occasions in the Fall of 2012 and also observed the green Chevy Tahoe

parked there on a regular basis. It appeared to investigators based on their surveillance that Nealy and Jones were residing there. (Id. ¶ 9.)

- A check of the Hartford Police Department in-house computer system identified 232 Westland Street as Jones's last address. Investigators subsequently conducted a motor vehicle stop of Nealy, Jones, and another associate in the Chevy Tahoe. During the stop, Jones identified his address as 232 Westland Street. (Id. ¶ 10.)

- On December 18, 2012, at approximately 8:35 a.m., investigators observed Jones drive from 71 Giddings Avenue to 232 Westland Street. Approximately five minutes later, Upshaw arrived in a rental vehicle at 232 Westland Street. At approximately 9:21 a.m., Tyson and Rivera arrived at 232 Westland Street in the green Infiniti and parked behind the building. At approximately 9:25 a.m. Tyson and Rivera drove away from 232 Westland Street in the green Infiniti. (Id. ¶ 11.)

- Investigators subsequently conducted a motor vehicle stop of the Infiniti and seized marijuana from Tyson's pocket and a box containing 63 grams of crack cocaine from the rear seat of the vehicle. (Id. ¶ 12.)

- After waiving her Miranda rights, Rivera told investigators that the crack cocaine was not hers and that they had just dropped Upshaw off at 232 Westland Street. (Id. ¶ 12.)

- After waiving his Miranda rights, Tyson told investigators that the crack cocaine belonged to Jones; that he purchased the crack cocaine from Jones for $1600; that he and Rivera went to the third floor apartment to pick up the crack cocaine from Jones; that Tyson had been purchasing crack from Jones for approximately one year; and

that Tyson had purchased crack from Jones on multiple occasions in the past from the third floor of 232 Westland Street.  (Id.)

- Shortly thereafter, Nealy arrived in the green Chevy Tahoe at 232 Westland Street and picked up Jones.  Investigators then conducted a motor vehicle stop of Nealy and Jones and seized approximately $4,000 from Jones and an undetermined amount of U.S. Currency from a duffel bag in the vehicle.  (Id. ¶ 14.)

- After the stop, investigators transported Jones back to 232 Westland Street.  After waiving his Miranda rights,[8] Jones said that he lives on the second floor of 232 Westland Street, that he had not seen Rivera that day, and that he does not have anything on the third floor of 232 Westland Street.  (Id. ¶ 15.)

- Investigators received consent from Nealy to search 71 Giddings Avenue and observed an empty money counter box.  (Id. ¶ 16.)

- A Hartford Police Department registered informant advised investigators that Jones lives on the second floor of 232 Westland Street and maintains a stash location on the third floor of 232 Westland Street.  (Id. ¶ 17.)

- Based on his training and experience, TFO Campbell knows that narcotics traffickers frequently maintain evidence concerning their narcotics activities in their residences, stash houses, businesses or within their vehicles, including records relating to the transportation, sale, and distribution of controlled substances, caches of drugs, scales, packaging materials, cutting agents and diluents, large amounts of currency, financial instruments, precious metals, jewelry and other proceeds of drug transactions, police

---

[8] As detailed above, although Jones disputes that he waived his Miranda rights and spoke to investigators, the Court credits the testimony of TFO Campbell on this point.

scanners used to detect law enforcement activity, and firearms or other weapons.  (Id. ¶ 18.)

Taken together, these statements are enough to support a finding of probable cause to search the second floor apartment at 232 Westland Street.  Jones argues that while there may have been probable cause to search the third floor apartment, there was not with respect to the second floor because, without the reference to the money counter seen during the pre-warrant entry, the statements in the Affidavit show only that  Jones lived on the second floor and this is insufficient.  (Def.'s Mem. Supp. Mot. Suppress at 20-23.)  The Court disagrees.  First, several of the statements in the affidavit identifying 232 Westland Street as Jones's residence refer to the address generally and do not reference any particular apartment number.  (Affidavit ¶¶ 8, 10.) Indeed, although investigators witnessed several individuals allegedly involved in the narcotics conspiracy drive up to 232 Westland Street on December 18, 2012, they apparently could not tell from their vantage point which floor those individuals may have visited once inside the three-family apartment building.  (Id. ¶¶ 11-14.)  Also, the information available to investigators at the time was that Jones used two floors – the second as a residence and the third as a place to conduct narcotics transactions.  (Id. ¶¶ 13, 15, 17.)  Further, even assuming that Jones did reside in the second floor apartment, as TFO Campbell states in his affidavit, based on his training and experience, narcotics traffickers frequently maintain evidence concerning their narcotics businesses in multiple locations, including within their residences, stash houses, businesses, or automobiles.  (Id. ¶ 18.)  The proximity between the second and third floors and the fact that, according to the information the investigators had at the time, Jones had access to both also made it reasonable for investigators to believe that they might find evidence of narcotics activity in both places.

### C.     Dodge Magnum

Jones argues that investigators did not have reasonable suspicion to stop the tow truck operator from towing the Dodge Magnum from 232 Westland Street.  Further, Jones claims that investigators did not have probable cause to search the vehicle and, even if they did, they were required to obtain a warrant before conducting the search.  (Def. Mem. Supp. Mot. Suppress at 25-31; see also Def.'s Supplemental Mem. [doc. #128].)    The Court addresses each of these claims below.

### 1.     Reasonable Suspicion to Stop the Tow Truck

The Fourth Amendment "permit[s] a brief detention of property on the basis of only 'reasonable, articulable suspicion' that it contains contraband or evidence of criminal activity." Smith v. Ohio, 494 U.S. 541, 542 (1990) (quoting United States v. Place, 462 U.S. 696, 702-03 (1983) (applying the principles of Terry v. Ohio to permit warrantless seizure of luggage where there is "reasonable, articulable suspicion, premised on objective facts, that the luggage contains contraband or evidence of a crime.")); see also United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992) (same); United States v. Van Leeuwen, 397 U.S. 249, 252-53 (1970) (permitting warrantless seizure of a suspicious mail package while police conducted further investigation).

Here, investigators were permitted to stop the tow truck operator from towing the Dodge Magnum because they had reasonable suspicion to believe that the vehicle contained evidence of a crime – like the luggage and mail package in the cases just cited.  Investigators observed Jones drive the Dodge Magnum to 232 Westland Street that very morning and had also observed the vehicle on one prior occasion during the course of their surveillance.  (12/12/13 Hr'g Tr. Vol. I at 70-71; 2/20/14 Hr'g Tr. Vol. I at 5, 51.)  Throughout their surveillance, investigators observed Jones and his associates driving multiple vehicles to conduct their narcotics business.  (12/12/13

Hr'g Tr. Vol. I at 36-50.)  Further, investigators knew that Jones had five prior convictions for narcotics-related offenses, with each one involving Jones operating a motor vehicle and the seizure of crack cocaine from either within the vehicle or from his person.  (2/20/14 Hr'g Tr. Vol. I at 54, 70-71.)

Moreover, during the stop of Tyson and Rivera at approximately 10:15 a.m., investigators learned that Jones tried multiple times to reach Rivera on her cell phone.  Investigators could have reasonably believed that Jones became concerned when Rivera did not answer her phone or return his calls.  (12/12/13 Hr'g Tr. Vol. I at 93.)  Fifteen minutes later, investigators observed Nealy pick up Jones at 232 Westland Street in what investigators might reasonably have suspected was an attempt to flee the scene.  Investigators stopped the vehicle, took Jones into custody, and seized approximately $4,000 from his person and $4,400 from the vehicle – giving them further grounds to suspect that Jones had recently engaged in drug transactions.  (Id. at 106, 120-21.)  Shortly thereafter, investigators observed a tow truck arrive at 232 Westland Street unannounced, place the Dodge Magnum on its lift, and start to pull out of the driveway. (12/12/13 Hr'g Tr. Vol. II at 14.)  Certainly, at this point, investigators had sufficient grounds reasonably to suspect that the Dodge Magnum, a vehicle that Jones had driven that very morning, might contain evidence of a crime.  They thus had a sufficient legal basis to order the tow truck driver to stop so that they could investigate further.  After stopping the vehicle, investigators spoke with the tow truck manager, who stated that a person named "Buck," a known alias of Jones's, called to have the vehicle towed because it had bad struts.  (Id. at 11.) Investigators had earlier observed, however, that Jones had driven the vehicle without incident from 71 Giddings Avenue in Windsor to 232 Westland Street in Hartford earlier that morning. (12/12/13 Hr'g Tr. Vol. I at 70-71.)  With their earlier suspicions heightened by this new

information, investigators then ordered the tow truck operator to remove the vehicle from the lift and return it to the back of the driveway.  (12/12/13 Hr'g Tr. Vol. II at 12.)

Once investigators learned from the tow truck manager that Jones had ordered the tow based on a story that conflicted somewhat with their own observations of a few hours earlier,, they had additional grounds to suspect that Jones was trying to remove from the scene evidence of a crime, and lawfully detained the vehicle while they conducted the search of the second and third floor apartments.[9]

### 2.    Probable Cause to Search the Dodge Magnum

The information obtained by investigators before searching the Dodge Magnum supplied probable cause to believe that it contained evidence of a crime.  After obtaining the warrant but before searching the Magnum, investigators searched the second and third floor apartments at 232 Westland Street and seized from the second floor substantial evidence that Jones was involved in narcotics trafficking.  (Id. at 27.)  After completing the search of the second floor apartment, TFO Campbell exited the building and approached the Dodge Magnum, which the tow truck driver had left in the driveway.  After doing so, he observed a box of ammunition in plain view through the rear hatch window of the Dodge Magnum.[10]  (Id. at 28-29; 30-35; Gov't

---

[9] To the extent that Jones is challenging the stop of the tow truck driver, he lacks standing to do so.  United States v. Padilla, 508 U.S. 77, 81 (1993) ("It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* fourth Amendment rights were violated by the challenged search or seizure.") (emphasis in original) (citations omitted).

[10] TFO Campbell was lawfully in a position to look in the window of the vehicle because he was on the property to execute a search warrant and, while the warrant itself was confined to the house, the driveway was next to the house.  See, e.g., United States v. Titemore, 437 F.3d 251, 260 (2d Cir. 2006) ("[W]hen a police officer enters private property for a legitimate law enforcement purpose and embarks only upon places visitors would be expected to go, observations made from such vantage points are not covered by the Fourth Amendment.") (internal quotation marks and citations omitted); United States v. Reyes, 283 F.3d 446, 465 (2d

Ex. 14C.)   As TFO Campbell knew that Jones was a convicted felon, this observation alone furnished probable cause to believe that the Dodge Magnum contained evidence of a crime.   (See supra n.7.)  In any event, when this was added to the other evidence known to TFO Campbell at this point, including the evidence seized from the apartment, there was ample probable cause to search the vehicle.

### 3.   Applicability of Automobile Exception to Warrant Requirement

The last and most difficult issue is whether investigators were required to obtain a warrant before searching the Dodge Magnum, which was located in the driveway at 232 Westland Street.  TFO Campbell had not sought, and Magistrate Judge Smith had not provided, authorization to search the Dodge Magnum.   Pointing out there was nothing preventing Campbell from seeking that authorization – either with the initial application or after the search of the second or third floors – and relying on the Supreme Court's plurality opinion in Coolidge v. New Hampshire, 403 U.S. 443 (1971) and the Second Circuit's decision in United States v. Lasanta, 978 F.2d 1300 (2d Cir. 1992), Jones argues that a warrant was required to search the Dodge Magnum while it was located in the driveway at 232 Westland Street.   Because the survival of the rule suggested in Coolidge is uncertain, because Lasanta has been narrowed to its facts, and because the facts of both cases are distinguishable, the Court disagrees.

In Coolidge, the Supreme Court invalidated a search of a vehicle that had been parked in the driveway of the defendant's residence before being towed to the police station.   Police officers searched the vehicle pursuant to a warrant that the Court later found to be invalid.

---

Cir. 2002) ("no Fourth Amendment violation based on law enforcement presence on an individual's driveway when that officer was in pursuit of legitimate law enforcement business.") (citation omitted).  In any event, for the reasons discussed below, Jones did not have a legitimate expectation of privacy in the driveway – a common area accessible to all tenants in the three-family apartment building and, apparently, the adjacent building.

Coolidge, 403 U.S. at 453.  The State argued that the search was nonetheless proper under the automobile exception to the warrant requirement, which the Court had first recognized in Carroll v. United States, 267 U.S. 132 (1925).  Id. at 453.  In Carroll, the Court had upheld the warrantless search of a vehicle where there was probable cause to believe it contained contraband.  Carroll, 267 U.S. at 153.  The Carroll Court had reasoned that it was "not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."  Id.; see also Chambers v. Maroney, 399 U.S. 42, 51 (1970) (holding that "exigent circumstances justify the warrantless search of an automobile stopped on the highway, where there is probable cause, because the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.").

In Coolidge, however, a plurality of justices found that the "exigent circumstances" cited in Carroll were absent.  Instead, the defendant's vehicle was parked in the driveway of the house – not "stopped on the highway" --, there was no suggestion that on the night of the search it was used for any illegal purpose, the defendant had already had ample opportunity to destroy any incriminating evidence because the police had detained and released him weeks earlier, and the items seized during the search were "vacuum sweepings," not contraband.  Coolidge, 403 U.S. at 448, 460.  Further, the defendant had been arrested and was in police custody at the time of the search, the defendant's wife, the only other adult occupant of the house, was driven by police to the house of a relative in another town, and the defendant's house was guarded throughout the night by two police officers.  Id. at 460-61.  Based on these facts, the plurality found that there was "no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the

evidence, not even the inconvenience of a special police detail to guard the immobilized vehicle." Id. at 462.  This was not a case, said the plurality, where "'it is not practicable to secure a warrant,' and the 'automobile exception,' despite its label, is simply irrelevant." Id. (quoting Carroll, 267 U.S. at 153.)

Similarly, in Lasanta, investigators seized defendant's vehicle without a warrant while it was parked in his driveway.  The Government argued that no warrant was required because there was probable cause to believe that the vehicle was subject to forfeiture as property used to further a drug offense.  The Second Circuit rejected this argument, noting that the language of the Fourth Amendment did not carve out "civil-forfeiture seizures in drug cases." Lasanta, 978 F.2d at 1305.  The Second Circuit went on to find that no other exceptions to the warrant requirement applied.  Addressing the automobile exception, the court stated that investigators "could have held no realistic concern that the car, parked not in a public thoroughfare, but in [defendant's] private driveway, might be removed and any evidence within it destroyed in the time a warrant could be obtained." Id.   The Second Circuit reasoned that defendant "was not operating the vehicle, nor was he in it or even next to it; when the agents knocked on his door to arrest him, he was inside his house, asleep." Id.  Moreover, the Court held that it was not impractical for investigators to obtain a warrant to search the vehicle because their surveillance made them aware of its presence and even if they were surprised by its presence, they could have posted an investigator to remain with the vehicle while they sought a warrant. Id. at 1305-06.

Over the years, however, the Supreme Court has chipped away at both of these decisions, and in the case of Coolidge at least, it is not clear there is anything left.  The "automobile exception" portion of the Coolidge opinion was a plurality opinion to begin with and thus not a binding one for lower courts.  Texas v. Brown, 460 U.S. 730, 737 (1983) (plurality opinion in

Coolidge concerning plain view doctrine not binding on lower courts because it was never expressly adopted by a majority of the Court).[11]  The notions of the "exigency" of circumstances and the "mobility" of an automobile – relied on in both Coolidge and Lasanta – have been expanded almost beyond recognition.  See, e.g., Maryland v. Dyson, 527 U.S. 465, 466 (1999) ("'automobile exception' has no separate exigency requirement"); Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."). Other aspects of both Coolidge and Lasanta have been outright overruled.  See Horton v. California, 496 U.S. 128, 137 (1990) (rejecting proposition in Coolidge that the plain view doctrine includes an inadvertent discovery requirement); Florida v. White, 526 U.S. 559 (1999) (recognizing forfeiture exception to warrant requirement for vehicle located on public property and as to which there was probable cause that vehicle had been used to effectuate drug transactions and was therefore itself subject to seizure as contraband under Florida law).

---

[11] Justice Harlan joined part II-D of the opinion – providing a fifth vote for that section only – much of which was devoted to responding to arguments made by a dissenting Justice. Nonetheless, part II-D also appears to be based on the notion that the police had ample opportunity – over two weeks from when they first began to suspect the defendant's involvement in the crime – to obtain a warrant, and nonetheless failed to do so before seizing the car *while it was on the defendant's property*, taking it to the police station, and searching it.  See 403 U.S. at 474 ("Both sides to the controversy [between those who would require a warrant for every entry and those who would dispense with a warrant requirement and evaluate every search for "reasonableness"] appear to recognize a distinction between searches and seizures that take place on a man's property – his home or office – and those carried out elsewhere.  It is accepted, at least as a matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances'.") (footnote omitted); id. at 478 ("Since the police knew of the presence of the automobile and planned all along to seize it, there was no 'exigent circumstance' to justify their failure to obtain a warrant.  The application of the basic rule of Fourth Amendment law therefore requires that the fruits of the warrantless seizure be suppressed.").  As discussed below, even assuming that notion still survives, this case is missing a key factual predicate for its application, *i.e.*, that the vehicle was located on the defendant's property when it was seized or searched.

The scope of the automobile exception has grown.  Supreme Court and Court of Appeals cases since Coolidge have held that the automobile exception permits the police to search any automobile found on public property as long as they have probable cause, regardless of whether there are exigent circumstances, regardless of whether the police had the ability or time to obtain a warrant, and regardless of whether the suspects are all in custody.  See, e.g., Labron, 518 U.S. at 940 ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."); United States v. Howard, 489 F.3d 484, 495 (2d Cir. 2007) ("Whether a vehicle is "readily mobile" within the meaning of the automobile exception has more to do with the inherent mobility of the vehicle than with the potential for the vehicle to be moved from the jurisdiction, thereby precluding a search.") (citation omitted).  And "public property" in this context is not just property owned by a governmental entity (like a street); it is any property in which defendant does not have a legitimate expectation of privacy.  See White, 526 U.S. at 566 ("because the police seized respondent's vehicle from a public area -- respondent's employer's parking lot -- the warrantless seizure also did not involve any invasion of respondent's privacy"); United States v. DeJear, 552 F.3d 1196, 1202 (10th Cir. 2009), cert. denied, 131 S. Ct. 363 (2010) (upholding warrantless search of a vehicle conducted in the driveway of a private residence that did not belong to defendant).

Indeed, several Court of Appeals cases have held that the plurality opinion in Coolidge does not even uniformly govern the basic scenario presented in that case, i.e., in which the defendant's vehicle is parked in the driveway of his own residence.  See, e.g., United States v. Goncalves, 642 F.3d 245, 251 & n.3 (1st Cir.), cert. denied, 132 S. Ct. 596 (2011) (citing United States v. Blaylock, 535 F.3d 922, 925-27 (8th Cir. 2008) (upholding warrantless search of

vehicle parked in defendant's own driveway), cert. denied, 558 U.S. 830 (2009); United States v. Hines, 449 F.3d 808, 810-15 (7th Cir. 2006) (same); United States v. Hatley, 15 F.3d 856, 858-59 (9th Cir. 1994) (same).  All of the recent Circuit cases addressing warrantless vehicle searches in private driveways have upheld them.  See, e.g., Goncalves, 642 F.3d at 251 & n.4 (citing DeJear, 552 F.3d at 1202; United States v. Brookins, 345 F.3d 231, 234-38 (4th Cir. 2003) (upholding warrantless search of vehicle conducted in private driveway that was not defendant's residence); United States v. Markham, 844 F.2d 366, 367-69 (6th Cir.), cert. denied, 488 U.S. 843 (1988) (same); United States v. Moscatiello, 771 F.2d 589, 599-600 (1st Cir. 1985), vacated on other grounds by, Murray v. United States, 487 U.S. 533 (1988) (same)).

The facts of Coolidge and Lasanta are, in any event, distinguishable from those in this case.  While it is true that by the time the Dodge Magnum was searched, all of the relevant suspects were in custody, investigators had secured the area, and there was no apparent reason investigators could not return to the federal courthouse to seek a second warrant (see, e.g., 12/12/13 Hr'g Tr. Vol. I at 102-03, 125; 12/12/13 Hr'g Tr. Vol. II at 7), it is equally true that the vehicle was not parked on the defendant's property – as it was in Coolidge and Lasanta.  (See supra n.12.)   The driveway in which the Dodge Magnum was parked was a common driveway accessible to the tenants of all three floors of 232 Westland Street and also apparently accessible to the tenants of what appears to be a multi-family building next door.  (See Gov't Ex. 7; see also 12/12/13 Hr'g Tr. Vol. II at 30 ("shared driveway").)  Jones testified that he does not own the property at 232 Westland Street and pays rent to the landlord.  He testified that his mother lives on the first floor, he resides periodically on the second floor with his "roommate" Upshaw, and other persons whom he has heard, but not seen, live on the third floor.  (2/20/14 Hr'g Tr. Vol. II at 14-15, 39-41, 46-47.)   Numerous cases have held that the common areas of apartment

buildings and multi-family homes, including common driveways, do not constitute areas of "curtilage" in which residents of individual living units have a legitimate expectation of privacy. See, e.g., United States v. Barrios-Moriera, 872 F.2d 12, 14 (2d Cir. 1989) (no legitimate expectation of privacy in a common hallway); United States v. Holland, 755 F.2d 253, 255 (2d Cir. 1985) (same); Maxis v. Philips, No. 10-cv-1016 (JG), 2011 U.S. Dist. LEXIS 41863, at *25 (E.D.N.Y. Apr. 13, 2011) (no legitimate expectation of privacy in a common driveway).

Further, Jones's unsuccessful attempt to have the Dodge Magnum towed from the driveway by a commercial tow truck operator and taken to a commercial garage diminishes his expectation of privacy in the vehicle. There is no doubt that had investigators allowed the tow truck operator to leave the driveway with the Dodge Magnum on the flatbed, the investigators could lawfully have stopped the tow truck on the public roadway en route to the commercial garage, and ordered the vehicle lowered. Once they had done that, and once they had observed the ammunition in plain view, they would have had probable cause to search the vehicle and they would not have needed a warrant under well-established case law. See, e.g., Dyson, 527 U.S. at 466 ("'automobile exception' has no separate exigency requirement"); Labron, 518 U.S. at 940 ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."); Chambers, 399 U.S. at 51 ("exigent circumstances justify the warrantless search of an automobile stopped on the highway, where there is probable cause").

The same analysis would apply if they had followed the tow truck to the garage and searched the vehicle there – the garage or commercial lot would be considered a "public area" in which Jones had no expectation of privacy. See White, 526 U.S. at 564-66. The fact that investigators chose instead to stop the tow truck from leaving the property in the first instance

should not change the analysis, because it does not change the fact that Jones had already decided to surrender whatever expectation of privacy remained in the vehicle.

This case is thus distinguishable from <u>Coolidge</u> and <u>Lasanta</u> in two important ways. First, although the Dodge Magnum was parked in a residential driveway, it was not a driveway in which Jones had any legitimate expectation of privacy because he could not exclude others from using it.  That fact alone takes this case outside the only situation in which <u>Lasanta</u> remains the law – and the only situation in which <u>Coolidge</u> might remain a guide to lower courts. Second, here, Jones had further diminished his expectation of privacy in the vehicle by calling for the tow; he had made the decision to entrust the vehicle to a third party.   That being so, this case falls in line with the "public place" cases in which the applicability of the automobile exception to the warrant requirement is well-established.

For all these reasons, the motion to suppress is denied.


IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                March 21, 2014